Not for Publication

## United States District Court
## for the District of New Jersey

| | |
|---|---|
| In re: | Case No. 10-18799 (DHS) |
| JOHN A. ROCCO CO., INC., | Adv. Proc. No. 12-1269 (DHS) |
| *Debtor*, | |
| | |
| PEACHTREE SPECIAL RISK BROKERS, LLC, | |
| *Appellant/Defendant*, | *Bankruptcy Appeal* |
| v. | Civil No. 14-1346 (KSH) |
| STEVEN P. KARTZMAN, as Chapter 7 Trustee, | **Opinion** |
| *Appellee/Plaintiff*. | |

This matter comes before the Court on appeal from two orders of the Honorable Donald H. Steckroth of the United States Bankruptcy Court for the District of New Jersey, entered on May 1, 2013 and December 9, 2013 (together, the "Orders"). The Orders were issued in connection with an adversary proceeding brought by Steven P. Kartzman as Chapter 7 Trustee to avoid and recover from Peachtree Special Risk Brokers, LLC ("Peachtree") two transfers totaling $138,114.50.

The May order denied Peachtree's motion for summary judgment, which sought dismissal of the avoidance proceeding on grounds that the transferred property was not part of the debtor's estate and that Peachtree was not an initial transferee. The December order granted the trustee's motion for summary judgment and avoided the transfers under Bankruptcy Code Section 547(b), rejecting Peachtree's argument that the transfers were not made on account of an

1

antecedent debt and, alternatively, that the transfers were a contemporaneous exchange of new value. For the reasons that follow, the Court affirms in part and remands for further consideration.

## I.   <u>Factual and Procedural History</u>

This case arises out of the bankruptcy proceedings of John A. Rocco. Co., Inc. ("Rocco" or "debtor"). While still in operation, Rocco brokered and produced lines of insurance for its clients and was licensed by the State of New Jersey's Department of Banking and Insurance. (DeGraw Cert., at ¶ 2.) Peachtree operated in a related capacity as a wholesale insurance broker, but was licensed and organized under the laws of the State of Georgia. (Nieman Aff., at ¶ 2.)

On July 30, 2009, Rocco and Peachtree entered into an agreement under which Rocco, as producer, arranged for contracts of insurance through companies that Peachtree represented. (Nieman Aff., at ¶ 3.) Essentially, Rocco worked for and on behalf of the insureds while Peachtree worked for and on behalf of the insurers. Both received commissions for their roles in the placement process. The first policy was placed with Navigators Insurance Company ("Navigators") for W5 Group LLC DBA Waldorf Holding Corp. (the "W5 Group") and required a $100,000 premium. (Nieman Aff., at ¶ 6.) The second policy, also for W5 Group, was placed with Axis Surplus Insurance Company ("Axis") and required a $94,500 premium. (Nieman Aff., at ¶ 7.) Both policies ran from July 29, 2009 to July 29, 2010.

On August 3, 2009, Rocco wired to Peachtree partial payment for the policies in the amount of $47,500. (Nieman Aff., at ¶ 8.) Peachtree apportioned the transfer *pro rata*—$22,500 to Axis and $25,000 to Navigators. (Nieman Aff., at ¶ 9.) These were only partial payments,

however, and the two policies were subsequently cancelled due to non-payment of the balance owed, effective September 21, 2009.  (Nieman Aff., at ¶ 10.)

Just a few days later, on October 2, 2009, Peachtree mistakenly transferred to Navigators $85,133.80 in full payment of that policy, less its 5% commission and Rocco's 10% commission. (Nieman Supp. Aff., at ¶ 9.)  Navigators later refunded that portion of the premium which was unearned as of the effective date of cancellation.  (Nieman Supp. Aff., at ¶ 10.)  Peachtree also transferred $18,562.50 to Axis on October 5, 2009, in partial payment of the Axis policy less commissions and credit for cancellation.  (Nieman Aff., at ¶ 12.)  The net effect of these transfers was that (1) under the Navigators policy, Peachtree received $25,000 from Rocco and paid $21,952.45 to Navigators and (2) under the Axis policy, Peachtree received $22,500 from Rocco and paid $18,562.50 to Axis. (Nieman Supp. Aff., at ¶ 11.)

Even though the policies had been canceled, Rocco wired Peachtree funds for both on January 22, 2010—$70,614.50 for payment to Navigators and $67,500.00 to Axis.  (Nieman Aff., at ¶ 13.)  Both payments were made from Rocco's trust account, maintained at TD Bank under account number 786-9329818, and were deposited in Peachtree's own trust account. (Nieman Aff., at ¶¶ 13, 16.)  On January 26, 2010, four days after Rocco sent Peachtree the funds, Peachtree paid Navigators and Axis the balance due on both policies less its own commission (Nieman Supp. Aff., at ¶¶ 21-22.)  As a result, both policies were reinstated. (Nieman Aff., at ¶ 14.)

On March 26, 2010, Rocco filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  (Am. Compl. at ¶ 1.)  The case was converted to Chapter 7 on February 7, 2012, at which time the trustee was appointed.  (Am. Compl. at ¶¶ 2-3.)  The trustee then

3

instituted an adversary proceeding against Peachtree to recover the payment it received from Rocco on January 22, 2010.  The trustee argues that, even though Peachtree forwarded the funds to Axis and Navigators four days later, Peachtree must repay that sum to the debtor's estate because it was received within ninety days of Rocco's petition for bankruptcy.  (Am. Compl. ¶¶ 19-23, 39-41).

## II.    Bankruptcy Court Rulings

Peachtree moved for summary judgment on June 22, 2012, seeking dismissal of the trustee's complaint on two alternate grounds.  First, Peachtree argued that the transferred funds were held in Rocco's trust account and should not be considered property of the bankruptcy estate.  The bankruptcy court disagreed and ruled in accord with the trustee's opposition and cross-motion for summary judgment, concluding that the trust account was commingled with non-trust property and therefore not properly maintained.  (May Op. at 14.)  As a result of the comingling, the bankruptcy court reasoned, Peachtree was obligated to trace the funds received in order to show that the transfers were properly exempt from the debtor's estate.  Because Peachtree did not even attempt to trace the transferred funds, the bankruptcy court concluded that the transfers were property of the debtor's estate.  (May Op. at 14.)

Peachtree's other argument was that it was not an initial transferee of the funds under Section 550(a)(1), but rather a mere "conduit" because it was not permitted to exercise legal control over the transferred property.  The bankruptcy court rejected this argument as well.  The court was persuaded by authority suggesting that a creditor-debtor relationship between the transferee and debtor defeated a conduit defense.  (May Op. at 16.)  Based on its finding that Peachtree advanced payment to Axis and Navigators on the debtor's behalf, the court held that

Peachtree was not a conduit, but an initial transferee, with regard to the transfers here.  (May Op. at 17-18.)

On July 10, 2013, the trustee moved for summary judgment on counts one and five of the amended complaint, seeking avoidance and recovery of the transfers under Sections 547 and 550 of the Bankruptcy Code.  Over Peachtree's arguments to the contrary, the bankruptcy court concluded that the transfers were made on an account of an antecedent debt based on the invoices Peachtree issued to Rocco around the time the policies were issued.  (Dec. Op. at 9-11.) Furthermore, the bankruptcy court found that the transfers did not constitute a contemporaneous exchange for new value because reinstatement of the insurance policies after their cancellation did not materially augment the debtor's estate.  On the basis of these findings, the court granted summary judgment to the trustee.

## III.   <u>Jurisdiction and Standard of Review</u>

This Court has jurisdiction over Peachtree's appeal pursuant to 28 U.S.C. § 158(a)(1). On appeal, this Court reviews "the bankruptcy court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof."  *Hefta v. Official Comm. of Unsecured Creditors (In re American Classic Voyages Co.),* 405 F.3d 127, 130 (3d Cir. 2005). Where the orders appealed present mixed questions of law and fact, this Court will apply the relevant standard to each issue.  *In re Sharon Steel Corp.*, 871 F. 2d 1217, 1222-23 (3d Cir. 1989).

Summary judgment is governed by Federal Rule of Civil Procedure 56, made applicable to adversary proceedings through Federal Rule of Bankruptcy Procedure 7056, and is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Bets v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citation omitted). The court interprets the evidence in the light most favorable to the non-moving party, while drawing all reasonable inferences in its favor. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 130 n.6 (3d Cir. 2001). The judge's function at summary judgment stage is not to weigh the evidence and "determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* The non-moving party must, however, present more than a "mere scintilla" of evidence, *Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770 (3d Cir. 2007), and must "do more than simply show that there is some metaphysical doubt as to the material facts*." Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

Peachtree presents four issues on this appeal of the bankruptcy court's summary judgment orders: (1) whether the court erred in holding that the funds transferred from Rocco's trust account were property of the estate; (2) whether the court erred as a matter of law *and* fact in holding that Peachtree was an initial transferee of the transferred funds; (3) whether the court erred in holding that the transfers were made on account of antecedent debt; and (4) whether the court erred in holding that Peachtree did not provide new value to the debtor by causing the policies' reinstatement. Because this Court is ordering a remand with respect to the second argument, it will address that issue last. As to the others, the Court affirms the bankruptcy court's holdings.

IV.   **Discussion**

**A.  The Transfers Were Property of the Estate**

Under Section 547(b) of the Bankruptcy Code, a trustee may "avoid any transfer of an interest of the debtor in property … made on or within 90 days before the date of the filing of the petition."  11 U.S.C. § 547(b)(4)(A).  The trustee holds this authority in order to "prevent a debtor from favoring a particular creditor by transferring property to [that] creditor shortly before the debtor files for bankruptcy."  *Flint Ink. Corp. v. Calascibetta*, 2007 WL 2687415, at *4 (D.N.J. Sept. 10, 2007).  To act on such authority, however, the trustee must first demonstrate that the property at issue belonged to the debtor's estate.

The Bankruptcy Code states that "all legal or equitable interests of the debtor in property as of the commencement of the case" are considered property of the estate.  11 U.S.C. § 541(a)(1).  But the Code also provides that "[p]roperty of the estate does not include any power that the debtor may exercise solely for the benefit of an entity other than the debtor," 11 U.S.C. § 541(b)(1), and this exception typically encompasses funds held by the debtor in trust.  *See Begier v. I.R.S.*, 496 U.S. 53, 58 (1990) ("[T]he debtor does not own an equitable interest in property he holds in trust for another, [therefore] that interest is not property of the estate, and, likewise, not property of the debtor."); *In re Columbia Gas*, 997 F.2d 1039, 1059 (3d Cir. 1993) ("[I]f the [debtor] holds the customer refunds in trust, as it asserts, these refunds are excluded from [the debtor's] bankruptcy estate and are immediately payable to its customers.").

It is not in dispute that the transfers here were drawn from the debtor's trust account, but this does not end the inquiry.  As the bankruptcy court found (and Peachtree concedes), the trust account also contained non-trust funds—specifically, the debtor's personal commissions.  *See* Peachtree Br. at 13 ("Here, there was an express trust, and the Transfers came from an actual

7

Trust account, albeit one in which the Debtor commingled funds.").  The bankruptcy court agreed with the trustee that, as a result of the commingling, Peachtree had to trace the funds received from Rocco, which it did not attempt to do.  Consequently, the bankruptcy court deemed the funds property of the estate.  (May Op. at 14.)

That conclusion is supported by the Third Circuit's decision in *In re Strategic Technologies Inc.*, 142 Fed. App'x 562 (3d Cir. 2005).  There, the debtor audited freight carrier invoices for its clients and informed them of any charges owed.  Client payments were deposited with the debtor and forwarded to the appropriate carrier.  Gulfstream Aerospace Corp. ("Gulfstream") was one such client, and it deposited $208,436.89 in the debtor's client account shortly before the petition for bankruptcy was filed.  *Id.* at 564.  Seeking return of those funds, Gulfstream argued that all of the money in the client account amounted to trust assets and was therefore exempt from the bankruptcy estate.  *Id.* at 565.  The court agreed that the client account constituted a constructive trust (therefore shielding its assets from the estate), but found that, as here, it was commingled with non-trust assets.

Drawing from its prior decision in *Goldberg v. N.J. Lawyers' Fund for Client Prot.*, 932 F.2d 273 (3d Cir. 1991), the Third Circuit instructed that "[w]hen funds are commingled, and a trust recipient claims a right in those funds, 'a claimant must make two showings: (1) demonstrate that the trust relationship and its legal source existed, and (2) identify and trace the trust funds if they are commingled.'" *Strategic Technologies*, 142 Fed. App'x at 566 (quoting *Goldberg*, 932 F.3d at 280). The *Strategic Technologies* court then held that "[b]ecause Gulfstream could not sufficiently identify its funds in the commingled account, all of the [client account funds] are presumed to be part of the bankruptcy estate."  *Id.* at 566.

8

Courts of other jurisdictions have reached similar conclusions.  In *In re Hedged-Investments Associates, Inc.*, 48 F.3d 470 (10th Cir. 1995), the trustee sought to avoid preferential transfers made in connection with a Ponzi scheme run by the debtor.  Similar to Peachtree's position here, one of the debtor's investors argued that all property held in trust was exempt from the debtor's estate, even where such funds were commingled with non-trust assets. *Id.* at 473.  The Tenth Circuit disagreed and held that, because the debtor's commingling made it impossible to trace the alleged trust funds at issue, the transfers were properly avoided under Section 547(b).  As in *Goldberg* and *Strategic Technologies*, the court noted first that "when property of the estate is alleged to be held in trust, the burden rests upon the claimant to establish the original trust relationship."  *Id.* at 474 (quoting 4 *Collier on Bankruptcy*, P. 541.13 at 541-76 to 79 (15th ed. 1994)).  Once that relationship is shown, the Tenth Circuit reasoned, the claimant must then "identify the trust fund or property in the estate and, if such fund or property has been mingled with the general property of the debtor, sufficiently trace the trust property."  *Id.* at 474. Significantly, the court noted that "[t]his principle holds true regardless of whether the funds are held in an express or constructive trust."  *Id.* at 474 (citing *In re Bullion Reserve of N. Am.,* 836 F.2d 1214, 1217 n.3 (9th Cir. 1988) ("[E]ven if an express trust were created, [the defendant] would still have a duty under federal bankruptcy law to trace his funds to the bullion he received.")).

Peachtree asks the Court to depart from *Strategic Technologies*, *Hedged-Investments Associates* and *Bullion Reserve*, and hold that "where there is an actual trust account, and a trustee or debtor seeks to recover an allegedly avoidable transfer, the trust account maintains its identity as a trust, and not the property of the debtor, even where commingling has occurred." (Peachtree Br. at 17).  It relies primarily on a decision in this district, *Flint Ink Corp. v.*

*Calascibetta*, 2007 WL 2687415 (D.N.J. Sept. 10, 2007) (Brown, C.J.), which arose out of the same bankruptcy proceeding as *Strategic Technologies* but reached a contrary conclusion. The *Flint Ink* bankruptcy court found that the transfers were wired from an express trust that was commingled with non-trust assets and imposed a tracing requirement on that basis.

The district court reversed, however, and exempted those finds in their entirety from the debtor's estate. *Id.* at *6. In reaching this conclusion, the district court distinguished *Strategic Technologies* and *Goldberg* on technical grounds—namely, differences in the relief sought in those actions. The court's reasoning was that the Third Circuit cases involved affirmative claims for the return of funds by trust beneficiaries, while in *Flint Ink* the trustee had brought an avoidance action. "A preference action requires the satisfaction by the Trustee of several factors", the court observed, and "can only be initiated under certain conditions which require the satisfaction of codified individual factors." *Id.* at *9. On this basis, the court found the "context" of *Goldberg* and *Strategic Technologies* "too dissimilar." *Id.* at *9.

Peachtree also relies on the Sixth Circuit's decision in *In re Cannon*, 277 F.3d 838 (6th Cir. 2002), where an attorney operated a check kiting scheme out of his real estate escrow account. The trustee there challenged funds drawn from the escrow account as fraudulent. The bankruptcy court entered judgment in favor of the trustee, and the district court reversed, finding that the trustee failed to establish that the funds held in trust were property of the estate. On appeal, the Sixth Circuit affirmed and held that "when Cannon deposited his own funds, small as they were, into the escrow accounts, he obtained no interest under Tennessee law in the trust corpus that would allow the bankruptcy trustee to avoid the transfers [] as fraudulent." The debtor's personal funds "became a part of the escrow account and are added to the sums held in express trust on behalf of Cannon's clients." *Id.* at 851. The Sixth Circuit based its holding on

the "undisputed" fact that "Cannon deposited personal funds in the escrow account in a vain effort to attempt to repay the misappropriated funds."   No such allegation is made here, however, and the decision is distinguishable on that basis.

The Sixth Circuit's decision in *Cannon* also suffers a more critical weakness—its failure to consider the policy underlying a trustee's avoidance power.  As the Bankruptcy Appellate Panels for the Sixth and Second Circuits[1] both observed, the tracing requirement serves a vital role in ensuring a *pro rata* distribution of the bankruptcy estate.  Without such a requirement, those courts reasoned, "insolvent trustees who have converted trust assets for their own use would be able to choose, on the eve of bankruptcy, who is to be repaid and who is not.  Thus, similarly situated creditors would receive disparate treatment."  *In re R.W. Leet Electronic, Inc.,* 372 B.R. 846, 855 (B.A.P. 6th Cir. 2007) (quoting *Daly v. Radulesco (In re Carrozzella &Richardson)*, 247 B.R. 595, 600-01 (B.A.P. 2d Cir. 2000).   The significance of that principle was recognized by the Third Circuit—even in those decisions that Peachtree claims can be ignored.  *See Strategic Technologies*, 142 Fed. App'x at 566 ("[W]hen one party is claiming assets that are commingled with the assets of someone similarly situated, this Court has indicated a preference for *pro rata* distribution."); *Goldberg*, 932 F.2d at 280 ("[C]ourts favor a *pro rata* distribution of funds when such funds are claimed by creditors of like status."); *see also In re Columbia Gas Sys., Inc.*, 997 F.2d 1039 (3d Cir. 1993) ("To protect the interests of secured and unsecured creditors, beneficiaries of trust funds bear the burden of identifying and tracing their trust property.").

---

[1]      Bankruptcy Appellate Panels, established under the Bankruptcy Reform Acts of 1978 and 1994, are three judge panels authorized to hear appeals of bankruptcy court decisions.  BAPs currently serve the First, Sixth, Eighth, Ninth and Tenth Circuits and, where established, will hear bankruptcy appeals directly, unless one of the parties to that appeal elects to be heard by the district court instead.  28 U.S.C. § 158

Based on these Third Circuit holdings, Peachtree is required to trace.  Because it failed to do so here, this Court finds that the funds transferred from debtor's account were property of the estate and affirms the bankruptcy court's May order to the extent it granted summary judgment to the trustee on that issue.

### B.  The Transfers Were Made on Account of Antecedent Debt

The trustee also bears the burden of proving that payments here were made on account of an antecedent debt.  11 U.S.C. § 547(g).  The Bankruptcy Code defines "debt" as "liability on a claim," 11 U.S.C. § 101(12), and "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."  11 U.S.C. § 101(5)(A).   While the Code does not define "antecedent," courts have found that "a debt is 'antecedent' when the debtor becomes legally bound to pay before the transfer is made."  *The Fonda Group, Inc. v. Marcus Travel (In re The Fonda Group, Inc.)*, 108 B.R. 956, 959 (Bankr. D.N.J. 1989).

Peachtree argued before the bankruptcy court that it had no claim against the debtor at the time of the transfers—and that no debt therefore existed—because the policies had already been cancelled.  But the trustee claimed that the debt was antecedent because the transfers were made on account of open, unpaid invoices issued to the debtor by Peachtree.  (Trustee Br. at 48.)  The trustee argued further that the language of the agreement supported this conclusion, as it expressly provides that "[debtor] guarantees the full payment due [Peachtree] of all premiums … on every contract bound or written for [debtor] pursuant to the Agreement.  [Debtor] shall be liable to [Peachtree] for the payment of all premiums, fees and taxes whether or not collected by [debtor]." (Nieman Cert., Ex. 1 at 2.)  Because the debtor paid the outstanding premiums roughly

six months after the policies were bound, the trustee argues that the payments were made on account of existing and antecedent debts.  The bankruptcy court agreed and this Court affirms.

As the Third Circuit has made clear, an antecedent debt exists when the right to payment arises, which is when the debtor obtains goods or services.  *In re First Jersey Secs., Inc.*, 180 F.3d 504, 511 (3d Cir. 1999).  The right to payment here—including Peachtree's right to its personal commissions—arose when the Navigators and Axis policies were bound in July 2009, as confirmed by both the invoices Peachtree issued to the debtor in July and August 2009 demanding payment in full for the premiums owed, (Nieman Cert., Exs. 2, 3. ), and the language of the Agreement itself. (Nieman Cert., Ex. 1 at 2.)  The transfers from the debtor to Peachtree were payments on account of an antecedent debt and the trustee's motion for summary judgment was properly granted as to this issue.

### C.  Contemporaneous Exchange of New Value

Peachtree also attempts to defend against the trustee's claims for avoidance with a Section 547(c)(1) new value defense, which prohibits avoidance to the extent that the transfer was intended by the debtor and creditor to be a contemporaneous exchange of new value.   11 U.S.C. § 547(c)(1).  To succeed, Peachtree must demonstrate that: (1) it provided new value to the debtor; (2) the parties intended a contemporaneous exchange; and (3) the exchange was in fact contemporaneous.  *See In re Hehinger Inv. Co. of Delaware, Inc.,* 489 F.3d 568, 574 (3d Cir. 2007).  The Code defines "new value" as "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an

existing obligation."  11 U.S.C. § 547(a)(2).  "In determining whether a creditor has extended 'new value,' the focus is not on the harm or detriment to the creditor, but rather the issue before the Court is whether there is an augmentation or material benefit to the debtor's estate."  *In re Kumar Bavishi & Associates*, 906 F.2d 942, 946 (3d Cir. 1990).

Peachtree argues that the contemporaneous exchange defense applies here because the value of the policy reinstatements equaled the value of the transfers, and that the transfers were intended to be substantially contemporaneous with reinstatement.  Peachtree explains the mechanics of that defense as follows:  As a result of the debtor's non-payment, the policies were cancelled and the debtor remained indebted to W5 Group for the funds it received.  This debt remained an obligation of the debtor until Peachtree reinstated the cancelled policies, although it was under no obligation to do so.  Taken together, Peachtree argues that if the debtor "had not made the Transfers and the Policies had not been reinstated by Peachtree, the debt which the Debtor owed to W5 Group for collecting the premium payments from W5 and failing to apply the full amount to the Policies could have been nondischargeable in the Debtor's bankruptcy case." (Peachtree Br. At 32).  Peachtree claims this to be a complete defense as to the funds received from Rocco on January 22, 2010.

To assume as much, however, is to agree that any act contributing to a particular result conveys the entire value of the result itself.  Accepting Peachtree's argument would therefore run afoul of the Third Circuit's requirement that, to establish new value, a creditor must prove the *specific dollar amount* of the new value, not merely that some benefit was conferred.  *See In re Spada*, 903 F.2d 971, 975-76 (3d Cir. 1990).  In *Spada*, the Third Circuit rejected the bankruptcy court's apparent conclusion that "once the creditor demonstrates that new value of any amount was conveyed to the debtor the entire transfer falls within the section 547(c)(1) exception to the

14

preferential transfer rule." *Id.* at 975.  What was required, the court found, was a direct comparison of the new consideration's value against the value of the asset actually conveyed.  To hold otherwise, would "dramatically hinder the goal of the preferential transfer rule."  *Id.* at 976. The Eleventh Circuit reasoned similarly in *In re Jet Florida Systems, Inc.*, 861 F.2d 1555 (11th Cir. 1988), finding that such an interpretation "would eviscerate the trustee's power to set aside preferential transfers."  *Id.* at 1559.  Without requiring specific proof as to the value received, the Eleventh Circuit found, "[a] creditor could retain the full value it received in exchange if it could show merely that the debtor and creditor intended for the 'new value' to be worth *something*, however hypothetical or ephemeral."  *Id.* at 1559 (emphasis in original).  The court then held that "a party seeking the shelter of section 547(c)(1) must prove the specific measure of new value given to the debtor in the exchange."  *Id.* at 1559.  The Third Circuit in *Spada* "agree[d] with this reasoning in its entirety."  *Spada*, 903 F.2d at 976.

Peachtree makes no showing as to the specific value it conveyed to the debtor and therefore cannot demonstrate that its reinstatement of the policies materially augmented the estate.  Having failed to prove that new value was conveyed, the Court need not consider Peachtree's argument that the apparent exchange was intended to be, and in fact was, contemporaneous.  The section 547(c)(1) and (c)(4) defenses do not apply here, and the Court affirms the bankruptcy court's December order as to those issues.

### D.  The Conduit Defense

Finally, Peachtree argues that it was not an initial transferee of the funds received.  Under Section 550(a) of the Bankruptcy Code the "trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from the initial transferee of such transfer or the entity for whose benefit such transfer was made."  The term

"initial transferee" is not defined in the Code.  But courts in the Third Circuit, like other

jurisdictions, have adopted the "dominion and control" or "conduit" test announced by the

Seventh Circuit in *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988).

*See, e.g., In re Lenox Healthcare, Inc.,* 343 B.R. 96, 103 (Bankr. D. Del. 2006) (citing to a

collection of cases in other jurisdictions acknowledging that "a defense to avoidance is available

to those entities which are 'mere conduits' of the avoided transfers"); *In re Parcel Consultants,*

*Inc.,* 287 B.R. 41, 46-47 (Bankr. D.N.J. 1992).  This test seeks to determine whether the recipient

was a "mere conduit" with regard to the property or "something more."  It asks whether that

recipient, at a minimum, had "dominion over the money or other asset, the right to put the money

to one's own purpose."  *Bonded Fin. Serv., Inc.*, 838 F.2d at 893. As the Seventh Circuit

observed, the term "transferee" must "mean something different from 'possessor' or 'holder' or

'agent.'  To treat 'transferee' as 'anyone who touches the money' and then to escape the absurd

results that follow is to introduce useless steps."  *Id.* at 894.

Peachtree argues that it was a mere conduit for the transfers and not an initial transferee

under the meaning of Section 550(a).  According to Peachtree, it "held the Transfers in a

fiduciary capacity, did not exercise any legal control over [the funds], and was unable to use the

transfers for Peachtree's own purposes."  (Peachtree Br. at 24).  With the exception of the

commission retained, Peachtree argues, the transfers were remitted from Peachtree's trust fund

directly to the insurers providing the coverage.  (Peachtree Br. at 24.).

The bankruptcy court disagreed and found that Peachtree was an initial transferee under

Section 550(a) of the Code.  But in reciting the facts supporting that holding, the bankruptcy

court found that "*[f]ollowing the two payments made by Peachtree* on January 22, 2010, totaling

$138,114.50, the Debtor wired Peachtree $70,614.50 for payment of the Navigators Policy and

16

$67,500.00 for payment of the Axis Policy, both from the Debtor's trust account."  (May Op. at 4-5) (emphasis supplied).  The court also found that Peachtree made "*advance payments for the Debtor* on the two insurance policies."  (May Op. at 16) (emphasis supplied).  These were factual errors that the bankruptcy court corrected in its December order where it clarified that Peachtree paid the insurers four days *after* receiving payment from the debtor, and further noted that, during this holding period, "Peachtree was only entitled to use the money for payment of premiums" to the insurers.  (Dec. Op. at 4).  Notwithstanding, the bankruptcy court did not revisit its holding that Peachtree was an initial transferee and therefore capable of exercising "dominion and control" over those funds.

Because the bankruptcy court was not using an accurate sequence of events, its reliance on *In re Lenox Healthcare, Inc.,* 343 B.R. 96, 103 (Bankr. D. Del. 2006) was misplaced.  That decision held that the conduit defense is not available to a recipient where the transfer of funds is to satisfy a prior debt or reimbursement for advance payments because in such circumstances the defendant is a creditor, not a conduit or an agent.  *Lenox*, 343 B.R. at 104-05.  But no advance payment was made here.  Rather, Peachtree was paid by the debtor, held that payment in trust, and forwarded the same to Navigators and Axis on the debtor's behalf four days later.

Peachtree argues that the Eleventh Circuit's decision in *Andreini & Co. v. Pony Express Delivery Services (In re Pony Express Delivery Services)*, 440 F.3d 1296, 1302 (11th Cir. 2006) controls.  In *Pony Express*, and like Peachtree here, the defendant was an insurance broker that accepted payments into a trust account and then remitted those funds to insurance carriers less its own commission.  Those funds were challenged as an avoidable preference under Section 547 and Andreini asserted the conduit theory as a defense.  Citing the Seventh Circuit's decision in *Bonded Fin. Serv., Inc. v. European Am. Bank.*, among others, the Eleventh Circuit explained

17

that "[u]nder [the conduit] test, a recipient of an avoidable transfer is an initial transferee only if they exercise legal control over the assets received, such that they have the right to use the assets for their own purposes, and not if they merely served as a conduit for assets that were under the actual control of the debtor-transferor or the real initial transferee." *Pony Express,* 440 F.3d at 1300. This test take on "special significance," the Eleventh Circuit added, where the recipients of avoidable transfers are "agents or fiduciaries of the debtor-transferor, such as banks or, in this case, *insurance brokers*, who are duty-bound to take only limited actions with respect to the funds received." *Id.* at 1300-01 (emphasis added).

Despite the fact that the funds sought to be avoided were reimbursement for payment already advanced, the court held that Andreini was a mere conduit and not an initial transferee. Andreini was a fiduciary with regard to the transferred funds and had "only limited legal control" over the wire transfer. "Without legal control to the extent that Andreini could put the assets to its own purposes," the Eleventh Circuit held, "it is not the initial transferee." *Id.* at 1303.

The question therefore remains: Was Peachtree permitted to exercise legal control over the transfers before forwarding payment to the insurers? The bankruptcy court effectively answered that question in the affirmative, but did so on the basis of an incorrect factual assumption. It does not appear that the court specifically addressed the conduit defense using the corrected record, or that in considering the conduit defense the bankruptcy court applied its specific finding that Peachtree's control of the money was limited by its obligation to use the funds for the single purpose of paying premiums. Given the significance of the issue of legal

control to the conduit test, this Court vacates the May order and remands so that the bankruptcy court can consider Peachtree's conduit defense on the corrected record.[2]

**V.**   **Conclusion**

For the foregoing reasons, the Court affirms in part the bankruptcy court's May order and remands for further proceedings consistent with this opinion.  The Court also affirms the December order to the extent it found that the "transfers were made on account of an antecedent debt, and were not a contemporaneous exchange for new value. An appropriate order will be entered.

/s/ Katharine S. Hayden<br>Katharine S. Hayden, U.S.D.J.

Date: December 29, 2014

---

[2]    The Court notes that, even upon consideration of the appropriate sequence of payment, the conduit defense likely does not extend to the commission that Peachtree retained.  Peachtree essentially agrees, (Peachtree Br. at 24 ("[W]ith the exception of the nominal commission payments received …, the Transfers were remitted from Peachtree's trust fund directly to the Insurers"), and case law supports that concession. *See Tese-Milner v. Moon (In re Moon),* 385 B.R. 541, 553 (Bankr. S.D.N.Y. 2008) ("[T]he majority rule is that where a mere conduit retains possession of the funds, he will be liable up to the amount which he retains.").  Over that retained amount, $15,870.60 here, Peachtree arguably exercised complete control and was "capable of using the funds for whatever purposes [it] wish[ed]."  *In re Parcel*, 287 B.R. at 46.